NEW YORK COUNTY.—ROBERT C. HUTCHINGS, SURROGATE.— DECEMBER, 1875.

DAMARELL v. WALKER.

*In the matter of the Guardianship of* KATE W. SHEPHERD, *an infant.*

A citation to answer a petition to remove a guardian must be served on the guardian, although she be incapacitated by insanity.

The "incompetency" for which a Surrogate may remove a guardian under 2 *Rev. Stat.* 152, § 14, has relation not merely to the mental condition and moral status of the guardian, but the court may take into consideration the relative, social and pecuniary position of the guardian and the infant, as affecting the interests of the latter in respect of nurture, care, education and safety.

The Surrogate has power to remove a testamentary guardian on grounds which will warrant the removal of a general guardian.

The fact that a will by which a guardian is appointed for an infant child of the testator, had been admitted to probate, there having been no

contest on the question of testamentary capacity, will not preclude the court from passing upon the question of the testator's mental condition, on a subsequent application to remove the guardian.

Previous insanity of testamentary guardian,—how far a ground for removal.

THIS was an application on the part of Mrs. Elizabeth T. Damarell to set aside an order of the Surrogate, made November 21st, 1873, removing her as testamentary guardian of Kate W. Shepherd, an infant under fourteen years of age; and a further application on behalf of Abby J. Walker to remove Mrs. Elizabeth T. Damarell, as testamentary guardian of the said infant.

On the 26th day of September, 1873, Samuel C. Shepherd, died leaving an infant daughter—his only child—of the age of about six years. She was his only heir and next of kin, his wife, the mother of the child, having died several years before. On the 6th day of December, 1870, Mr. Shepherd, made his last will and testament, which was regularly admitted to probate by the Surrogate of the county of New York on the 17th day of October, 1873, the proper citations having been previously issued and served. No opposition was made to the probate of the will. By this will, the testator appointed Mrs. Elizabeth T. Damarell the testamentary guardian of his infant daughter, Kate W. Shepherd. After the will was admitted to probate, and on the 23d day of October, 1873, Sarah W. Shepherd, claiming to be the paternal grandmother of this infant child, presented a petition to the Surrogate praying for the appointment of James E. Ward as the general guardian of the person and estate of this child. A citation was issued to Robert McC. Shepherd, Sophia C. Davis, Mrs. E. A. Chitton, Edward J. Walker, Emily H. Walker, and Abby J. Walker, requiring them to appear on the 10th day of November, 1873, and show cause why letters of guardianship should not be issued, as prayed for in the petition.

Subsequently, and on the 18th day of November, 1873, a counter-petition was presented to the Surrogate, by Edward J. Walker, Emily H. Walker, and Abby J. Walker, praying for the appointment of Emily H. Walker as such guardian. Mrs. Damarell, who was appointed by the will of Mr. Shepherd testamentary guardian of his infant child, was not made a party to, nor notified of, either of these proceedings. On the 21st day of November, 1873, an order was made by the Surrogate, appointing Emily H. Walker the guardian of the estate and person of said infant in the place and stead of Elizabeth T. Damarell.

Mrs. Damarell at this time did not know that she had been appointed testamentary guardian by the last will and testament of Mr. Shepherd. She was not aware of her appointment until a long time afterwards. On the 21st of November, 1874, Mrs. Damarell presented to the Surrogate her petition setting forth the foregoing facts, and praying that the order of November 21st, 1873, by which she was removed and Miss Emily H. Walker appointed the guardian of the infant child, Kate W. Shepherd, be opened, set aside, and vacated. On the 26th of January, 1875, Miss Abby J. Walker presented her petition praying that Mrs. Damarell might be removed from the guardianship of the child, Kate W. Shepherd. Miss Walker alleged in her petition that the testator, Samuel C. Shepherd, was of unsound mind, and that the appointment of Mrs. Damarell as testamentary guardian was void and of no effect. She also alleged that Mrs. Damarell was, at the time of the death of Samuel C. Shepherd, and for a long time prior thereto, had been, of unsound mind, and that, by reason of such unsoundness, she was still incompetent to be such guardian of the infant child, Kate W. Shepherd, and to discharge said duties.

On the 14th of February, 1875, Mrs. Damarell answered the petition last referred to, and put in issue the material facts therein set forth. She denied the insanity of Samuel C. Shepherd, and her own unsoundness of mind, and alleged the unfitness of Miss Walker as guardian of the child. The testimony was taken in both proceedings at the same time, and it was understood that the testimony, as far as applicable, should apply to both proceedings, viz. : the proceeding on the part of Mrs. Damarell to set aside the order of November 21st, 1873, removing her as guardian, and appointing Miss Walker ; and the proceeding upon the petition of Miss Abby J. Walker (presented the 26th of January, 1875) to remove Mrs. Damarell as testamentary guardian.

DAVID R. JAQUES, *and* HENRY L. CLINTON, *for Mrs. Damarell.*

JOSEPH H. CHOATE, *opposed.*

THE SURROGATE.—The facts in the case are briefly as follows :

Mr. Shepherd was a member of a successful firm of shipping merchants in the city of New York, and resided on Thirty-fifth Street at the time of his death, which occurred by suicide in September, 1873. He had lost his wife in 1868, five years before his own death. She died shortly after giving birth to the infant, the custody of whom is the matter now at issue. Mrs. Damarell was employed as the monthly nurse of Mrs. Shepherd at the time of the birth of the child, and she remained in the house thereafter for a period of a few days from Mrs. Shepherd's death. Some weeks subsequently, on the recommendation of Dr. F. N. Otis, the family physician, she was employed by Mr. Shepherd as housekeeper, and was entrusted with the special care of the infant, in which position she remained employed continuously until the latter part of 1872.

Mr. Shepherd was married to Miss Kate Walker, the mother of his child, about the year 1858. His wife was a member of a very intelligent and wealthy family, residing and occupying a high social position in the city of Boston. After their marriage, Mr. and Mrs. Shepherd kept house in Brooklyn and New York, until the time of the wife's decease, and thereafter he continued the establishment until his death in September, 1873.

Subsequent to the death of his wife, Mr. Shepherd became subject to periods of great mental depression and melancholy, as proven by the testimony of Mr. Ward and Mr. Booth, his partners, Mr. Taebing, Dr. Otis, Mrs. Culbert, and Mr. Bergen. The despondency which overcame him at these periods was so deep, that he announced that he expected to die in an insane asylum; that his firm had sustained great losses, and that ruin was impending, when in fact they were in the midst of great prosperity; and under such belief, he even curtailed his household expenses to an almost absurd extent. He wrote to his wife's sister, Miss Abby Walker, a month before the date of making his will, a letter, in which he spoke of great financial embarrassments; and a year after, when he had recovered from the attack, upon the return of Miss Walker to America, he reminded her of the letter, and stated that what he had written was untrue, and that at the period when it was written, he was insane.

It is not necessary for me to state in detail the evidence upon the question which has been raised, as to Mr. Shepherd's own insanity; but I am of the opinion that he was a victim of that phase of mental impairment described as melancholia, and which had its culmination in suicide by shooting himself with a pistol, in September, 1873.

Mr. Shepherd's will was subsequently offered for pro-

bate. No one appeared to contest the justness of its provisions, else perhaps the validity of the instrument, and especially of the clause appointing Mrs. Damarell the testamentary guardian of the child, might have been contested *in limine*, on the ground of his own insanity, and a decision might have been had thereon.

Mrs. Damarell being then confessedly insane, and the child being left without any one to take legal charge of her person and property, a petition was filed by Mrs. Shepherd, the paternal grandmother, asking for the appointment as guardian of Mr. Ward, Mr. Shepherd's late partner; and another was filed by Mr. Edward J. Walker, asking for the appointment of Miss Emily H. Walker, a maternal aunt. The two petitions were considered in the one proceeding. There probably would have been no disagreement at the beginning had not papers been found after Mr. Shepherd's death, which shewed that he had a hostile feeling towards his wife's sisters, the Misses Walker. But on the hearing before me, November, 1873, the testimony of the Misses Walker and other witnesses proved that the feelings of Mr. Shepherd had been based upon an absolute delusion in reference to the facts, and the application of Mrs. Shepherd, the grandmother, was withdrawn, and by consent, Miss Emily H. Walker was appointed to the guardianship, with the entire approval, so far as known, of all the relatives of the child.

Mrs. Damarell, although the testamentary guardian, had no part in that proceeding, nor was she cited on it, which was undoubtedly an oversight, and was fatal to the order which I then made, so far as it purported to remove her from the position to which she had been appointed by the will. The statute requires a citation to be served upon a testamentary guardian, upon an application for removal. But the evidence shows that, had

a citation been issued to her, she was then in no condition to appear at the hearing, and assert her claims to the child, or to exercise the functions of guardian. Indeed, she slept upon her rights for a year subsequent to the granting of the order removing her and appointing Miss Walker, before she came to court, through her counsel, to demand a recognition of her rights under the will. The reason of this will be the subject of consideration hereafter; but as the rights of Mrs. Damarell were not affected by the first proceeding, by reason of her not being made a party thereto, the order then granted, so far as it purports to remove her, should be vacated, and a decree will therefore be entered to that effect.

The proceeding, therefore, now before me, is upon the application of Miss Abby J. Walker to remove Mrs. Damarell, as testamentary guardian, on the ground of incompetency, and for the appointment of Miss Emily H. Walker, a maternal aunt, who now has custody of the child under the previous order appointing her to the guardianship. The statute upon that subject is as follows:

" On the application of any ward or of any relative in his behalf, or of the surety of a guardian, before the Surrogate who appointed any guardian, or to the Surrogate before whom any last will and testament containing an appointment of a guardian shall be or shall have been proved, complaining of the incompetency of such guardian, of his wasting the real or personal estate of his ward, or of any misconduct in relation to his duties as guardian, the Surrogate, upon being satisfied by proof of the probable truth of such complaint, shall issue a citation to such guardian to appear before him, at the day and place therein specified, to show cause why he should not be removed from his guardianship." (2 *Rev. Stat.* 152, § 14.)

The word " incompetency," as applied to guardianship, is one, in my judgment, of broad signification and comprehensiveness, like the word unsuitableness, as applied to a trustee. In my opinion, it has relation, not merely to the mental condition and moral status of a testamentary guardian, but imports that, in the interests of the child in respect of nurture, care, education, and safety, the court may take into consideration the relative, social and pecuniary position of the guardian and the infant. I must admit frankly, that, in the full appreciation of the discretion that is vested in this as in all courts having jurisdiction of the guardianship of minors, who are, in fact, wards of the court, my judgment is averse to the separation of a child, bereft of its parents, from its parents' relatives who are fitted to take their place, and especially from one who, through ties of sisterly affection to the mother, clings to a child with as much affection as though she were her own, and, still further, where there is reasonable ground to believe that there is incompetency on the part of the person named as guardian in the will. The fact that the Legislature has empowered the court to remove such guardian for incompetency, vests it with discretion to decide upon the competency of the person named for the position in the will of a testator. Suppose Mr. Shepherd, a man of wealth and high social position, had, in making his will in 1870, (when I am satisfied from the evidence he was in a disordered mental condition), selected an inferior domestic in his house as the guardian of his child, would it not be within the province of the court, considering the social status of the parents and of the families to which they belonged, the child being the inheritress of wealth, to removed such person from the guardianship, and to vest it in others of undoubted " competency" or fitness ? To my mind there would be no question in reference to its power.

A letter written by Mr. Shepherd soon after the death of his wife, to her sister, Miss Abby Walker, shows that he regarded her as the one, above all others, to whose care and nurture the child should be confided, though, two years after, he executed a will, in which he appointed as testamentary guardian, Mrs. Damarell, a stranger to the blood of himself and wife, and whose social position and education were below that of the child's parents. In view of his previously expressed feelings in reference to Miss Walker, his sudden change of sentiment exhibited in the appointment of Mrs. Damarell is only to be ascribed to the fact of an insane condition, which had its manifestations in the manner I have previously described, and in imaginary slights which he stated he and his wife had received at the hands of her sisters; and which was further manifested in the extravagant views he expressed in reference to the importance of the recovery of Mrs. Damarell to the interests of his household, and especially of his child. In fact, it is evident to my mind that both the testator and the testamentary guardian were insane—the affliction overcoming Mr. Shepherd in the fall of 1870, about the period when the will was executed, and Mrs. Damarell a year subsequent, in the fall of 1871.

In reference to the insanity of Mrs. Damarell, there is, in my opinion, no doubt. Between the fall of 1871 and the period of Mr. Shepherd's death, she had two distinct attacks. She recovered from the first and remained in an apparently normal condition for about six months, when she had a relapse, from which she had not recovered at the time of Mr. Shepherd's death; nor did her friends deem her in a condition to apply for a recognition of her rights as testamentary guardian until more than a year after his death. Before this affliction overcame her, the evidence shows that she was calm

and self-possessed; that afterwards she lost control of her nervous system, and was depressed, and exhibited symtoms of mingled melancholia, hypochondria and hysteria, so much so that Dr. Peaslee, her physician, stated that her brain was a "great deal affected," and he considered it better that she should not be left alone. Dr. Otis, though not her physician, had frequent opportunities of seeing her at Mr. Shepherd's house during this period, and he testified on the first proceeding, in the fall of 1873, to her unfitness to take charge of the child on account of her mental disorder, which he then pronounced a case of suicidal mania. And though Dr. Otis, when subsequently called in the present proceeding, as a witness in behalf of Mrs. Damarell, qualified his previous testimony, there is no doubt upon the evidence that she was for a long period insane.

But, in behalf of Mrs. Damarell, it is contended that the mental disturbance which affected her proceeded from the cessation of a function peculiar to women, and occurring in middle age; and both Dr. Peaslee and Dr. Otis stated that the cause of the mental disturbance having passed never again to return, there was, in their opinions, no danger of recurrence of the disorder.

The question, therefore, which is presented to me at this time is whether Mrs. Damarell, though at present apparently recovered, is in such condition as to justify me in deciding that it would be safe to entrust her with the guardianship of the person of the infant, she having been, within a short period, twice a subject of insanity.

Mrs. Damarell has appeared in court during these proceedings, and she is apparently sane. She has testified in the case as a witness, and exhibits now, I am frank to say, all the evidences of recovery; but it is, however, very difficult to state whether a person who has been insane is free from the danger of a recurrence

of the malady, and I mightsay it is always difficult for a court, and sometimes even for physicians, to decide whether a person thus affected has, in fact, recovered. The fact that Mrs. Damarell appears in court, and that she acts and speaks rationally, is not conclusive to me, a ayman, of her absolute recovery. Courts are often obliged to have recourse to the aid of professional gentlemen who have become experts through education, observation and experience in the determination of this most abstruse question of insanity.

Two physicians have been called on each side upon the question of the liability of a recurrence of the mental disease which overcame Mrs. Damarell—Dr. Otis and Dr. Peaslee in her behalf, and Dr. Choate and Dr. Clymer in behalf of Miss Walker. Dr. Otis has had no special experience in the treatment of diseases of the brain, and his views upon the subject of a non-recurrence of the mental disturbance of Mrs. Damarell are based upon the theory that, as the cause which incited the insanity cannot occur again, there is no likelihood of her again becoming insane. Dr. Peaslee has had a much larger experience – his specialty being the treatment of diseases of women—and he states that out of probably fifty cases of mental disturbance, occurring at the period of the female climacteric, which have come under his observation, he has not had more than ten worse than that of Mrs. Damarell; that of those ten, probably five died, and of the other five, some committed suicide. Certainly, based upon Dr. Peaslee's own showing, the occasional violence in the manifestation of the insanity does not afford a satisfactory assurance of safety to one entrusted to Mrs. Damarell's care, in case of a recurrence.

Dr. Clymer and Dr. Choate, very distinguished alienists, and who have had long experience in the treat-

ment of diseases of the brain and nervous system, have given their testimony upon the subject of a liability to a recurrence of insanity in Mrs. Damarell, and I regard their statements as entitled to great weight. All I consider necessary in this connection is, to generalize their conclusions, based upon carefully collated statistics, which show that the liability to a recurrence of insanity, where persons have once been affected, is from fifty to sixty-five per cent., and that they see no reason for supposing that insanity occurring at the time of the female climacteric should form any exception to the general rule. They believe that the cessation of the sexual function, occurring at that time, it being a natural and normal event in the course of woman's life, should not, of itself, be the cause of insanity, and that, if insanity does occur as its concomitant, it is where there has been latent disease of the brain existing previously, or an inherent constitutional tendency to such disease, which is called into activity by the physical disorders attendant upon cessation of the sexual function referred to

The cross-examination of these experts by the counsel for Mrs. Damarell was able, elaborate and exhaustive; but, in my opinion, it failed to alter the aspects of their testimony, which was, that Mrs. Damarell, having had two attacks of insanity, the probability of another was further increased. I must accept their evidence as controlling, as all courts are obliged to accept that of distinguished experts in those branches of science to which they have devoted their lives.

It has been stated in evidence, that Dr. Hammond and Dr. Brown, of the Bloomingdale Asylum, both specialists of large experience in the treatment of mental diseases, were called by Mrs. Damarell's friends to see her, during the year 1874; but neither of them has been produced as a witness, which is to be regretted, as doubtless their testimony would have thrown addition-

al light upon the matter at issue, they having had the advantage of a personal observation of Mrs. Damarell, which neither Dr. Clymer nor Dr. Choate had.

Certainly, Mrs. Damarell, at the time of the death of Mr. Shepherd, was not, and had not been for over a year previous, nor was she for months afterwards, by reason of her insanity, a proper person to have the custody of the child. The evidence which has been given of her incompetency, during that period, is not disputed. It is impossible to predict what may be the ultimate condition of a person who has been afflicted with a mental aberration. Who could have foreseen that Mr. Shepherd, who exhibited only irritability, depression of spirits, suspicions of his partner's sentiments towards him, and of his wife's sisters, and misjudgment of the importance of Mrs. Damarell, in respect to the care of his child, would, within a brief time, have committed suicide with a pistol ? In view of this tragic culmination of insanity in this very household, without recurring to the illustrations in medical literature, it appears to me that I would be taking a responsibility which no court would be justified in doing, were I to give this child to the care of a testamentary guardian, who has been twice insane, and confessedly incompetent for a long period to assume a trust which was given to her by the will of Mr. Shepherd; and in this serious aspect of the case, I cannot assume it.

There is another consideration which has some weight with me in the disposition of this case. The counsel for Mrs. Damarell strenuously object to her removal as testamentary guardian. But the responsibility placed upon me is a grave one, even viewed in respect of the interests of the child. Two considerations as affecting her, present themselves to my mind. One is, that her comfort, happiness, culture and education are reasonably assured, under favorable circumstances

DAMARELL *v.* WALKER.

and surroundings, in the care of her aunt, the present guardian; the other is a want of such assurance, even with the best of intentions, in view of disparity of social position and education between Mrs. Damarell and the family of the child. The aunt is a lady of wealth, education, and refinement, occupying a superior position in New York and Boston society. The child, who is the principal object of her affection, as representing a deceased sister, between whom and herself great affection existed, is now about eight years of age, and has been two years under her present guardians, and undoubtedly, regards her with the same feelings she would entertain for her mother, if living. Mrs. Damarell, on the contrary, is a lady in very moderate circumstances; and though married, is not living with her husband, and has not been since her advent into the house of Mr. Shepherd, in the year 1868. Her previous employment had been that of a monthly nurse. She has no income, and her testimony shows that she has had limited facilities for obtaining education, not having attended school since she was twelve years of age; while she is no connection by blood with the child proposed to be placed in her care. Her acquaintance with Mr. Shepherd's family, and the care she exercised over the child until overcome by her own mental disabilities, were the result of accidents —the child's birth and the mother's death.

I am asked, under the forms of law, to separate the child from its natural guardian; to remove her from associations which she is entitled to continue from the condition of her birth; to deprive her of the opportunities of education and of her proper place in society, which are now reasonably assured, and virtually to place her in a lower station in life, with associations which cannot be congenial, and to deprive her of that affection to which she has been accustomed during the last two years.

It would be a most serious act for me to perform. It would be little less than judicial cruelty; and a court, in my opinion, would not be justified in so doing. But, in deciding the matter at issue, I am not governed by those considerations, except collaterally. In view of the statute, especialy taking the word "incompetency" in its broad signification of unsuitableness, and applying it to the past condition of Mrs. Damarell, and with the possibility, even, of a recurrence of her mental disorder and its consequences upon the destiny of the child, I hold that the application of Miss Abby J. Walker, for the removal of Mrs. Damarell, as testamentary guardian should be granted, and a decree to that effect will therefore be entered, and leave the appointment of Miss Emily H. Walker, as guardian of the child, heretofore entered, with the bonds given thereunder, to remain in full force and effect.

Ordered accordingly.